UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/06/2017

W.M. & D.M. on behalf of V.M.,

                          Plaintiffs,

                  v.

Board of Education of the Harrison
Central School District,

                          Defendant.

No. 16-cv-8732 (TPG)

**OPINION**

Before the court are cross-motions for summary judgment in this action arising under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et. seq.* (2012). Plaintiffs W.M. and D.M. ("Parents") brought the instant case on behalf of their son V.M. ("V"). Defendant is the Board of Education of the Harrison Central School District ("District"). Plaintiffs seek reversal of the decision rendered by the New York State Reviewing Officer ("SRO"), which affirmed the decision of the Impartial Hearing Officer ("IHO") that the District provided V a Free and Appropriate Public Education ("FAPE"), and denied Parents tuition reimbursement for V's alternative placement at a private school during the 2012-13 school year. For the reasons provided below, the court agrees with the SRO and the IHO that the District did not deny V a FAPE and further

1

agrees that Parents are not entitled to reimbursement. Accordingly, the court denies Parents' motion for summary judgment and grants the District's motion for summary judgment.

## BACKGROUND

### I.    Legal Framework

Under the IDEA, states receiving federal education funding are required to provide all children with disabilities a Free and Appropriate Public Education ("FAPE"). 20 U.S.C. § 1412(a)(1)(A); *see also Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005). To provide a disabled child with a FAPE, the state must provide "special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A); *see also J.S. v. N.Y.C. Dep't of Educ.*, 104 F. Supp. 3d 392, 400 (S.D.N.Y. 2015). The Individualized Educational Plan ("IEP") is the centerpiece of and "[t]he primary vehicle for implementing these congressional goals." *Honig v. Doe*, 484 U.S. 305, 311 (1988).

Under New York law, an IEP is developed during meetings of the local Committee on Special Education ("CSE"), comprised of, among others, the child's Parents, the child's teacher, a school psychologist, a qualified district representative " 'knowledgeable about the general curriculum and the availability of resources of the school district,' and an additional parent representative." *J.S.*, 104 F. Supp. 3d at 400 (quoting N.Y. Educ. Law § 4402(1)(b)(1)(a) (McKinney 2017)). After examining the child's level of achievement and specific needs, the CSE must determine an appropriate educational program, set forth in an IEP,

which is "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ.*, 458 U.S. 176, 207 (1982); *see also R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012).

If a parent believes that the resulting IEP does not comply with the IDEA, the parent has the option to file a " 'due process complaint' (a type of administrative challenge unrelated to the concept of constitutional due process) with the appropriate state agency." *R.E.*, 694 F.3d at 175. A hearing is then held before an Impartial Hearing Officer ("IHO"), during which the school district bears the burden of proving the adequacy of the proposed educational programming. N.Y. Educ. Law § 4404(1); *see also F.O. v. N.Y.C. Dep't of Educ.*, 976 F. Supp. 2d 499, 506 (S.D.N.Y. 2013). Such claims are governed by a two-year statute of limitations, which begins to accrue on the date that a plaintiff "knew or should have known about the alleged action that forms the basis of the complaint." 20 U.S.C. § 1415(b); *see also Somoza v. N.Y.C. Dep't of Educ.*, 538 F.3d 106, 114 (2d Cir. 2008). Claims filed after the two-year limitations period are time-barred, unless "the parent was prevented from requesting the hearing by the local educational agency's misrepresentations, or because the agency withheld information it was required to provide." *M.G. v. N.Y.C. Dep't of Educ.*, 15 F. Supp. 3d 296, 304 (S.D.N.Y. 2014); *see also Somoza*, 538 F.3d at 115.

If a parent elects to "unilaterally place the child in a private school and seek retroactive tuition reimbursement," she does so at her own risk and bears the burden of proving that the placement was appropriate during the IHO hearing. *F.O.*, 976 F. Supp. 2d at 506 (citing N.Y. Educ. Law § 4404(1)(c)). Under

the *Burlington/Carter* reimbursement test, courts will require the school district to pay for the private school tuition only if: "(1) the program recommended by the IEP was inadequate or inappropriate; (2) the alternative placement the Parents chose was appropriate; and (3) the equitable factors weigh in favor of reimbursement." *J.S.*, 104 F. Supp. 3d at 400-01.

Either party may appeal to a State Review Officer ("SRO") if dissatisfied with the IHO's ruling. *A.M. ex rel. Y.N. v. N.Y.C. Dep't of Educ.*, 964 F. Supp. 2d 270, 275 (S.D.N.Y. 2013). After exhausting the administrative remedies available through these processes, either party may then "bring a civil action in state or federal court to review the SRO's decision." *Id.* Importantly, "[f]ailure to exhaust the administrative remedies deprives the court of subject matter jurisdiction." *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245 (2d Cir. 2008). For this reason, "absent the district's or IHO's consent to a timely amendment," only issues that were raised in a plaintiff's due process complaint may be considered by the district court. *Id.* at 283 (quoting *M.R. v. Orangetown Cent. Sch. Dist.*, No. 10 Civ. 1800 (CS), 2011 WL 6307563, at *13 (S.D.N.Y. Dec. 16, 2011)).

When a parent challenges a district's decision under the IDEA in federal court, "the court 'conducts a review of both the procedural and substantive adequacy of the underlying decision.' " *Y.N.*, 964 F. Supp. at 278 (quoting *B.O. v. Cold Spring Harbor Cent. Sch. Dist.*, 807 F. Supp. 2d 130, 134 (E.D.N.Y. 2011)). Parents are automatically entitled to reimbursement if the court determines the IEP was substantively inadequate. *Id.* Procedural violations, however, warrant reimbursement only if, taken together, they "impeded the child's right to a

[FAPE], significantly impeded the parents' opportunity to participate in the decisionmaking process, or caused a deprivation of educational benefits." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 190 (2d Cir. 2012) (internal quotations omitted) (quoting 20 U.S.C. § 1415(f)(3)(E)(ii); *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009)).

The IDEA provides aggrieved parties who wish to bring a civil action in federal court "90 days from the date of the decision of the hearing officer to bring such an action." 20 U.S.C. § 1415(i)(2)(B). However, if state law provides an "explicit time limitation for bringing such action," the state limitations period applies. *Id.* New York provides such a limitation in New York Education Law § 4404(3)(a), which requires aggrieved parties to commence such proceedings "within four months after the determination to be reviewed becomes final and binding on the parties."

## II.    Factual Background

V.M. ("V") was born in Moldova in 2002. ECF No. 1, at 1. V and his sister were being raised in an orphanage where V received no formal education and failed to develop proficiency in any language. ECF No. 27, at 1. V has been diagnosed with Fetal Alcohol Effects, Attention Deficit Hyperactivity Disorder, temper dysregulation issues, Mood Disorder, Reactive Attachment Disorder, and Developmental Coordination Disorder. ECF No. 1, at 1. In 2008, W.M. and D.M. ("Parents") adopted V and his sister. ECF No. 1, at 1. When V arrived in the United States, he did not speak English and had trouble communicating with Parents. ECF No. 27, at 2. V also lost any native language he had acquired due

to language attrition. ECF No. 24, at 3. Parents reside with their children in the Harrison Central School District ("District"). ECF No. 1, at 1.

A. 2008-09 School Year – Kindergarten

V was enrolled as a student in a District general education kindergarten class for the 2008-09 school year. ECF No. 27, at 1. On June 19, 2009, after Parents referred V to the CSE, the District found V ineligible for special education and related services. ECF No. 24, at 3; SRO Decision, at 2. Finding that the information available was insufficient to properly assess V's needs, the CSE adjourned the matter and ordered a neuropsychological evaluation. ECF No. 27, at 3. The CSE would then review the results and re-convene to "make a more informed determination as to eligibility." Dist. Ex. 1, at 2; Parents Ex. JJJ, at 6; ECF No. 27, at 3.

School psychologist, Dr. Boris Gindis, performed the requested evaluation over the course of two days on August 20 and August 21, 2009. *See* Parents Ex. QQQ (Developmental, Neuropsychological and Educational Assessment Report). After extensive discussion regarding V's developmental history, behavioral issues, academic skills, and general cognitive abilities, Dr. Gindis found that "[t]he most appropriate and least restrictive environment placement for [V] in September 2009 [was] an inclusive (integrated classroom)." Parents Ex. QQQ, at 3. Otherwise, "a regular education first grade with a package of supportive services, classroom accommodations, and behavior modification programming could serve as a viable equivalent of an 'inclusion' setting." Parents Ex. QQQ, at 3. Dr. Gindis noted that with a support and remedial system in place, V's "level

of mastery or pre-academic and emerging literacy skills" would "allow him to benefit from a first grade level of mainstream instruction." Parents Ex. QQQ, at 3.

B. 2009-10 School Year – First Grade

The CSE re-convened on October 21, 2009 to consider the information generated by Dr. Gindis's report, and deemed V "eligible for and in need of special education services" as a student with an "Other Health Impairment." Parents Ex. JJJ, at 1, 6; SRO Decision, at 3; ECF No. 24, at 4. The CSE recommended a general education program with pull outs, consisting of (1) a 5:1 resource room for 45 minutes, 5 times per 6-day cycle; (2) 5:1 counseling for 30 minutes, once per week; (3) 5:1 occupational therapy ("OT") for 30 minutes, two times per week; and (4) 5:1 speech-language therapy for 35 minutes, 3 times per 6-day cycle. Dist. Ex. 1, at 2; Parents Ex. JJJ, at 1.[1] In March of 2010, as a result of behavioral issues, V was moved to a general education class with 45 minutes of integrated co-teaching ("ICT") support services per day. SRO Decision, at 3; Dist. Ex. 1, at 2. In June 2010, V was placed in the ICT class full-time. Dist. Ex. 1, at 2. These changes were made without a CSE meeting, but with Parents' full consent and support. ECF No. 27, at 5.

---

[1] The ratios refer to class staffing ratios, which indicate the number of students to the number of full-time special education teachers (e.g., 5:1). Where a ratio contains three numbers, the third refers to the number of full-time paraprofessionals (e.g., 8:1+2). Bonnie Brown, Description of Class Staffing Ratios, District 75, N.Y.C. Dep't of Educ., schools.nyc.gov/documents/d75/district/staffing_ratios.pdf.

### C. 2010-11 School Year – Second Grade

V started the 2010-11 school year in a general education classroom with ICT services and pull outs—a less restrictive setting than his full-time ICT placement at the end of the previous school year. Parents Ex. YY, at 1. Just before the school year started, Parents had contacted the District to request that the CSE meet to develop an IEP and arrange a Functional Behavioral Analysis ("FBA") for their son. ECF No. 25, at 4. The CSE convened on October 26, 2010. Parents Ex. YY, at 2. Parents and school staff agreed that V's behavior remained a challenging issue because it was unpredictable and could change quickly. Parents Ex. YY, at 6. The "[i]mplementation of an FBA was discussed but placed on hold until the effects of . . . new medication on [V's] behavior could be evaluated." Parents Ex. YY, at 6.

The CSE ultimately recommended the following for the remainder of V's second grade year: (1) 12:1 ICT for 4 hours per day; (2) 5:1 counseling for 30 minutes, 2 times per 6-day cycle (an increase from 1 time per week); (3) 5:1 occupational therapy for 30 minutes, 1 time per 6-day cycle (a decrease from 2 times per 6 day cycle); and (4) 5:1 speech-language therapy for 35 minutes, 2 times per 6-day cycle (a decrease from 3 times per 6 day cycle). Parents Ex. YY, at 2. The following month, in November 2010, the District developed an FBA and a Behavior Intervention Plan ("BIP") for V. Parents Ex. CCCC, at 1, 3.[2]

At Parents' request, the CSE re-convened a few months later to reevaluate V's placement. Dist. Ex. 8, at 3. On January 5, 2011, the CSE found that V had

---

[2] Parents originally contended that no BIP was created or implemented. Dist. Ex., at 3.

"significant delays in language skills, motor skills, behavioral and attentional skills which inhibit[ed] progress in the general education curriculum." Dist. Ex. 8, at 3. Accordingly, the CSE recommended "a change in placement to the district special class at Preston, to address the student's current emotional, behavioral and learning needs." Dist. Ex. 8, at 6. The IEP states that a general education setting was rejected because V's "current management needs indicate[d] that a more intensive setting with support [was] needed to address the student's needs." Dist. Ex. 8, at 7.

The CSE met again on May 19, 2011 to conduct an annual review for the upcoming 2011-12 school year. Dist. Ex. 12, at 1. With respect to the mid-year class change, the IEP notes that V transitioned well and "improve[d] in his ability to negotiate the educational and social environment." Dist. Ex. 12, at 6. While on occasion, the classroom teacher had restrained V, the intensity and duration of his tantrums had been significantly decreasing, while his ability to accept redirection and practice safe behaviors had increased. Dist. Ex. 12, at 6. Overall, V's transition to the new class was positive, "as evidenced by [his] better ability to cope with academic and social demands and regulate [his] behavior." Dist. Ex. 12, at 6.

V's educators described progress in specific areas. V's speech-language therapist noted that during structured tasks, V demonstrated a better understanding of grade-level linguistic concepts such as irregular verb tenses and plurals. Dist. Ex. 12, at 2. V's occupational therapist found improvements in his visual tracking, endurance, and bilateral integration skills. Dist. Ex. 12,

9

at 2. V's psychologist saw that in his new placement, V was beginning to internalize rules, display curiosity, and demonstrate preferences among activities. Dist. Ex. 12, at 2. Parents agreed that V demonstrated significant progress during the 2010-11 school year. Dist. Ex. 12, at 2. They felt the new placement had helped him and were pleased with his development, particularly in reading. Dist. Ex. 12, at 2. During the CSE meeting, "Parents indicated that behavior [was] still the greatest area of concern, but [had] improved." Dist. Ex. 12, at 2. While V continued to struggle in certain areas, including during the less structured dialogs of speech therapy, his progress trended upward. Dist. Ex. 12, at 2. For example, while V's psychologist noted that he could still become upset, the frequency and intensity of his tantrums had decreased significantly.[3]

The CSE recommended that V remain in the special 8:1+2 class, and continue the same program of "counseling, speech-language therapy, and occupational therapy to address academic, behavioral, language and motor needs." Dist. Ex. 12, at 2. To additionally target social-emotional and language skills, the CSE recommended that V continue speech-language therapy and counseling twice a cycle. Dist. Ex. 12, at 2.

### D. 2011-12 School Year – Third Grade

At Parents' request, the CSE reconvened on December 15, 2011. Dist. Ex. 13. Parents sought to discuss a number of topics including V's counseling services, Parents' desire for an FBA and BIP, certain cognitive-behavioral

---

[3] The court notes the unfortunate typographical error in the CSE notes, which omit the word "decreased," but can safely assume the intended meaning of the sentence based on context. *See* Dist. Ex. 12, at 2 ("He still becomes upset but the frequency and duration of tantrums and acting-out behaviors has significantly.").

techniques, and Parents' concerns about V's physical safety. Dist. Ex. 13, at 2. During the meeting, V's special education teacher, the school principal, and the school psychologist each related their observations and interactions with V, during which he was happy, engaged, and on task. Dist. Ex. 13, at 2. V's teacher explained that his behavior was well-managed in the small, structured class environment, and that he generally required only mild-to-moderate verbal prompting. Dist. Ex. 13, at 2. She reported that physical intervention had only been necessary on two occasions. Dist. Ex. 13, at 2. Additionally, the teacher noted that V had successfully "pushed in" to a number of mainstream opportunities with the general education classes, including science lab and other special events. Dist. Ex. 13, at 2. Finally, she stated that there had been "no occurrences of toileting accidents in school." Dist. Ex. 13, at 2. The meeting ended, and the CSE did not change the IEP. Dist. Ex. 13, at 3.

E. 2012-13 School Year – Fourth Grade

The CSE developed the IEP at issue after its meeting on June 18, 2012, during which it conducted an annual review for V's fourth grade school year. Dist. Ex. 27. V was still classified as a student with an "other health impairment." Dist. Ex. 27, at 1. By this time, Parents had already placed V at Winston Preparatory School ("Winston Prep"), a private institution. Dist. Ex. 27, at 1. Participants at the CSE meeting included Susan Lockhart, Chairperson; Linda Kalos, School Psychologist; Jan Bailey, Special Education Teacher; Sarah Palefsky, General Education Teacher; Linda Warsaw, ESL Teacher; Joann Raguso, Speech-Language Therapist; Mario Pellegrino, Occupational Therapist;

Louanna Andralliski, Chairperson (Elementary); Robert Kalman, Principal; Thomas Scapoli, School Attorney; Gina DeCrescenzo, Parent Attorney; D.M., Mother; W.M., Father; Susan Adler, Private Psychologist; and Mark Goldenberg, Private Therapist.[4] Dist. Ex. 27, at 1. The CSE recommended "continuation of the 8:1+2 special class (ESP), counseling, speech-language therapy, and occupational therapy and consult, to address academic, social-emotional, and management needs." Dist. Ex. 27, at 4.

## III. State Administrative Proceedings

### A. Due Process Complaint and IHO Decision

Parents filed their due process complaint on June 17, 2012, and on June 19, the case was assigned to IHO Wendy K. Brandenberg. IHO Decision, at 178. Over the course of nineteen (19) days of hearings, IHO Brandenberg addressed Parents' complaint that the District failed to provide V with a FAPE for the 2012-13 school year. IHO Decision, at 4. IHO Brandenberg identified and addressed nine District failures alleged in Parents' due process complaint. Specifically, Parents contended that with respect to the 2012-13 school year, the District failed to (1) provide an appropriate placement that adequately addressed V's academic, physical, social, and emotional needs; (2) conduct an FBA to determine the hypothesized function of V's interfering behaviors; (3) develop and implement an appropriate BIP; (4) offer adequate alternative behavior modification services, including cognitive behavioral therapy, 1:1 support, home-

---

[4] The Volunteer Parent Member requirement was waived. Dist. Ex. 27, at 1.

based therapy, family training, or family counseling; (5) use an appropriate, scientifically-based methodology and/or strategy based on peer-reviewed research to address V's maladaptive behaviors; (6) appropriately address bullying; (7) provide appropriate counseling services; (8) provide adequate speech and language services; and (9) provide appropriate reading services. IHO Decision, at 4-5. Additionally, Parents claimed that Winston Prep was an appropriate placement for V for the 2012-13 school year and that the equities weighed in favor of reimbursement for school tuition. IHO Decision, at 5.

IHO Brandenberg did not consider a number of issues raised by Parents in their closing brief that had not been raised in their due process complaint. Among these were a range of issues related to the District's use of physical restraints as well as other denials of FAPE for the 2010-11 and 2011-12 school years. IHO Decision, at 178. More generally, IHO Brandenberg found that any of Parents' claims that accrued before June 16, 2012 were time-barred under the two-year statute of limitations for challenging the CSE's June 2012 IEP.[5] IHO Decision, at 178. As for the claims that were timely raised, IHO Brandenberg found that the District provided V a FAPE, addressing each of Parents' arguments in turn.[6]

In concluding that the District's IEP for the 2012-13 school year was reasonably calculated to confer upon V meaningful educational benefit, IHO

---

[5] IHO Brandenberg also found that Parents' claims pertaining to bullying were time-barred, but found that, in any event, the District responded to Parents' complaints appropriately. IHO Decision, at 217.
[6] The IHO Decision is approximately 240 pages long and includes a thorough discussion of each conclusion.

Brandenberg made the following findings: (1) the IEP accurately reflected the results of evaluations to identify V's needs; (2) the IEP contained appropriate annual goals related to the Student's needs; and (3) the CSE recommendations were appropriate and consistent with its legal obligation to provide an educational program for V in the least restrictive environment ("LRE"). IHO Decision, at 188-203. In concluding that the District's failure to conduct an FBA and a BIP during the 2012-13 school year did not amount to the denial of a FAPE, IHO Brandenberg found that the evidence showed: (1) V's behaviors were effectively managed in the emotional support program that he was moved to in the middle of the 2010-11 school year; (2) the IEP for the 2012-13 school year set forth detailed information with respect to V's social development and management needs; and (3) the 2012-13 IEP set forth appropriate social, emotional, and behavioral goals. IHO Decision, at 206.

In analyzing Parents' claims that the District failed to provide adequate alternative behavior modification services or use an appropriate, scientifically-based methodology during the 2012-13 school year, IHO Brandenberg found that the District offered appropriate services insofar as (1) V would have received 1:1 services when needed through his placement in the emotional support class and mainstream placements with a special aide; and (2) that cognitive behavioral therapy, home-based therapy, family training, and family counseling were not required to facilitate a FAPE for V. IHO Decision, at 212. With respect to Parents' claims related to social skills training, appropriate counseling services, speech and language services, and reading services, IHO Brandenberg concluded that V

had made progress in each area under the programming implemented by the District, and that the CSE's continuing recommendation for said programming was reasonably calculated to confer meaningful educational benefit. IHO Decision, at 221 (social skills), 225 (counseling), 234 (speech and language), 238 (reading).

Having found that the District met its burden in proving the appropriateness of its recommended placement, IHO Brandenberg did not reach the question of whether Winston Prep constituted an appropriate placement or whether Parents' claim for reimbursement was supported by equitable considerations. IHO Decision, at 238.

### B. SRO Decision

Parents appealed the IHO decision, and the case was assigned to SRO Steven Krolak. SRO Decision, at 27. Parents claimed that the IHO erred by: (1) disregarding the District's programming for the 2010-11 and 2011-12 school years; (2) failing to find that the November 2010 FBA and BIP were invalid or unsound; (3) finding it appropriate that the June 2012 CSE determined that an FBA and BIP were not required for V, despite his maladaptive behaviors; (4) finding V's behaviors were effectively managed during the 2011-12 school year; (5) refusing to consider Parents' claims with respect to physical restraints used during the 2010-11 and 2011-12 schools years; (6) holding that the June 2012 CSE provided V with appropriate counseling and social skills training; (7) determining that the District provided V with appropriate speech-language and reading services; and (8) finding V made progress during the 2011-12 school

year, notwithstanding V's failure to make progress in certain areas during those years. SRO Decision, at 6. Parents also asserted that the IHO erred insofar as it failed to determine that Winston Prep was an appropriate placement for V for the 2012-13 school year. SRO Decision, at 6.

On July 8, 2016, SRO Krolak dismissed the appeal in its entirety. SRO Decision, at 27. First, SRO Krolak determined that the IHO was correct to deem any claims that accrued on or prior to June 16, 2012 time-barred under the two-year statute of limitations applicable to claims under the IDEA. SRO Decision, at 5. This included Parents' claims related to the District's use of physical restraints and their claims related to the validity of the November 2010 FBA and BIP. SRO Decision, at 5. SRO Krolak considered the facts underlying these claims to the extent they were relevant to Parents' timely claims. SRO Decision, at 5.

Second, SRO Krolak determined that, contrary to Parents' assertions, IHO Brandenberg considered the District's programming for the 2010-11 and 2011-12 school years, and that the evidence supported her determination that V made progress while in the emotional support class. SRO Decision, at 8. In reaching this conclusion, SRO Krolak considered the hearing record; an academic behavior log kept by V's special education teacher, Ms. Bailey; IEP progress reports; report cards; and V's scores from various tests and evaluations conducted between 2010 and 2012. SRO Decision, at 9-12. SRO Krolak found that after the District placed V in the emotional support class, he made progress in each of the areas Parents identified. SRO Decision, at 13. The record

demonstrated academic progress in (1) reading, math, and writing; (2) social, emotional, and behavioral functioning; and (3) speech-language and motor skills. SRO Decision, at 13.

Next, SRO Krolak found that the record supported IHO Brandenberg's determination that the June 2012 CSE recommended adequate special education services, including counseling, social skills instruction, speech-language therapy, and reading services, based on V's needs. SRO Decision, at 13. In making this determination, SRO Krolak looked to the evaluative information the June 2012 CSE considered—a May 30, 2012 OT evaluation report, a June 1, 2012 educational achievement assessment report, a 2011-12 report card, a June 5, 2012 neuropsychological evaluation report, and a June 12, 2012 physician letter. SRO Decision, at 13.[7]

Lastly, SRO Krolak addressed Parents' claim that the IHO erred in finding that the June 2012 CSE properly determined that V did not require an FBA and a BIP. SRO Decision, at 19. First, in light of behavioral issues that persisted throughout the 2011-12 school year, SRO Krolak noted that the June 2012 CSE should have conducted an FBA and a BIP. SRO Decision, at 20. However, he found this failure did not amount to a denial of a FAPE because the CSE had sufficient evaluative information regarding V's behavioral needs, which were adequately identified and described in the June 2012 IEP. SRO Decision, at 20. Similarly, the failure to develop a BIP did not amount to a denial of a FAPE

---

[7] The SRO decision reviews these documents at length, and also includes discussion specific to the individual achievement test results. SRO Decision, at 13-19.

because the CSE adequately addressed V's social, emotional, and behavioral needs with appropriate supports and strategies. SRO Decision, at 22-26. Viewing these failures cumulatively, SRO Krolak determined that the record supported the IHO's finding that they did not constitute or contribute to the denial of a FAPE for V. SRO Decision, at 27.

## C. Procedural History of This Action

Parents filed the instant complaint on November 10, 2016, challenging the SRO's decision. ECF No. 1. On August 8, 2017, Parents filed their motion for summary judgment, and defendants also filed a cross-motion for summary judgment. ECF No. 14; ECF No. 16.[8]

## STANDARD OF REVIEW

In the IDEA context, motions for summary judgment are in substance an appeal from the final state administrative decision. *S.W. v. N.Y.C. Dep't of Educ.*, 92 F. Supp. 3d 143, 154 (S.D.N.Y. 2015). In this way, they function as " 'a pragmatic procedural mechanism' for reviewing administrative decisions." *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009) (quoting *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005)). As the Second Circuit has noted, when "reviewing a dispute over an IEP, the district court occupies 'the paradoxical position of [being] both an independent fact finder and a judicial body bound to review and give deference to the findings of

---

[8] The court notes that plaintiffs' motion was originally dated April 25, 2017 and the defendant's motion was originally dated June 9, 2017. *See* ECF No. 14, at 2. August 8, 2017 is the date on which the papers were electronically filed with this court.

an administrative agency.' " *F.O.*, 976 F. Supp. 2d at 511 (quoting *Wall v. Mattituck-Cutchogue Sch. Dist.*, 945 F. Supp. 501, 507 (E.D.N.Y. 1996)).

On the one hand, the court is tasked with "more than an inquiry into possible disputed facts [and] must conduct an 'independent' review of the administrative record . . . bas[ing] its decision on the 'preponderance of evidence.' " *Id.* (quoting *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005) and *Bd. of Educ. V. Rowley*, 458 U.S. 176, 205 (1982)). On the other hand, it must be sure to give "due weight" to the IHO and SRO proceedings, "mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.' " *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 113 (2d Cir. 2007) (alterations in original) (quoting *Rowley*, 458 U.S. at 206). To ensure that its independent review of the sufficiency of an IEP "does not 'impermissibly meddl[e] in state educational methodology,' " a court must limit its examination of the record to " 'objective evidence' that indicates 'whether the child is likely to make progress or regress under the proposed plan.' " *Gagliardo*, 489 F.3d at 113 (quoting *Walczak v. Fl. Union Free Sch. Dist.*, 142 F.3d 119, 130 (2d Cir. 1998)).

The federal courts' role "in reviewing state educational decisions under the IDEA" is thus described as "circumscribed." *Id.* (quoting *Miller v. Comm. on Special Educ.*, 145 F.3d 95, 101 (2d Cir. 1998)). The deference owed to an administrative decision "depends on the quality of that opinion," which is a product of the same factors that "determine whether any particular judgment is persuasive"—its reasoning and its grounding in a demonstrated familiarity with

the record. *R.E.*, 694 F.3d at 189. In *M.H. v. New York City Department of Education*, 685 F.3d 217, 244 (2d Cir. 2012), the Second Circuit provided a helpful list of examples that demonstrate the types of determinations that call for more or less deference:

> [D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures. Decisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress. . . . And the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency.

In sum, the court should accord substantial deference to state administrative determinations pertaining to educational policy, and should accord deference to factual findings by administrative decision makers, "provided they are 'reasoned and supported by the record.'" *B.K. v. N.Y.C. Dep't of Educ.*, 12 F. Supp. 3d 343, 356 (E.D.N.Y. 2014) (quoting *Gagliardo*, 489 F.3d at 113). With respect to questions of law, however, the court need not give due weight to the administrative decisionmaker's conclusions. *Id.* As statutes of limitations present a question of law, the court may make this determination without according deference to the SRO decision. *F.L. v. Bd. of Educ.*, 15-cv-5916 (SJF) (GRB), 2017 WL 3574445, *9 (E.D.N.Y. Aug. 15, 2017) (quoting *Y.A. v. N.Y.C. Dep't of Educ.*, No. 15 Civ. 5790, 2016 WL 5811843, at *8 (S.D.N.Y. Sept. 21, 2016)).

## DISCUSSION

### I.  Statute of Limitations for the Instant Action

The court rules that the District has failed to meet its burden with respect to its argument that the instant action is time-barred. The issue before the court is whether the four-month period contemplated by section 4404 of the New York Education Law begins to run when the SRO decision is issued or at the time it is received. N.Y. Educ. Law § 4404(3)(a) (McKinney 2017). While defendants submit that the decision became "final and binding on the parties" when it was issued on July 8, 2016, ECF No. 25, at 5-6, plaintiffs submit that finality attached only when they received notice of the decision "by mail on July 11, 2016." ECF No. 28, at 5. Under defendant's interpretation, plaintiffs' November 10, 2016 complaint was untimely by two days. Under plaintiffs' interpretation, the complaint was filed one day before the four month period expired. ECF No. 1.

The District does not dispute that plaintiffs received the SRO decision by mail on July 11, 2016. ECF No. 28, at 5. Instead, it argues that the three-day extension available under Federal Rule of Civil Procedure 6(d) does not apply, because the relevant limitations period is not based upon receipt of the underlying decision. ECF No. 25, at 6-7. However, defendant's argument rests on the debated presumption that section 4404 is not based upon receipt. Plaintiffs argue persuasively that the "final and binding" language employed in section 4404, which is "identical to that in section 217 of the Civil Practice Law and Rules" ("C.P.L.R."), was intended to maintain that section's well-established

date-of-receipt rule. ECF No. 28, at 3. As other courts in this Circuit have found, nothing in section 4404 "indicates that [it] was meant to alter the meaning of the language drawn from the C.P.L.R," which has "widely been interpreted to impose a limitation period running from the aggrieved person's receipt of the decision to be reviewed." *Y.D. v. N.Y.C. Dep't of Educ.*, No. 14 CV 1137 (LTS), 2016 WL 698139, at *7 (S.D.N.Y. Feb. 19, 2016).

Defendants direct the court's attention to a number of cases in which other courts have "clarified that the statute of limitations starts to run from the date of the decision of the SRO or the hearing officer." ECF No. 25, at 7. The court finds these decisions are not on point. First, in *B.D. v. District of Columbia*, 817 F.3d 792, 800 (D.C. Cir. 2016), the court was primarily concerned with whether the IDEA "provides a cause of action to enforce a favorable hearing officer decision." The statute of limitations was discussed only to the extent it reinforced the court's reading of the plain text to exclude such a cause of action. *Id.* at 802. The *B.D.* court's passing mention of the limitations period running "from the issuance of the hearing officer's decision" was intended to contrast a hypothetical limitations period running "from the moment of noncompliance," which would more likely indicate the drafters' intent to include a cause of action for enforcement of a favorable decision. The court was not presented with, and did not focus on, the implications of the word "issuance" in the statute of limitations provision of the IDEA.

Second, in *J.S. v. District of Columbia*, 533 F. Supp. 2d 160, 162 (D.D.C. 2008), the court was presented with a related, but not dispositive, question—

whether Federal Rule of Civil Procedure 6(e) applies "to the institution of IDEIA cases." Finding that Rule 6(e) did not apply to IDEA cases, the court in *J.S.* held the parties to the "strict 90-day time limit" because the IDEA does not mention "the timing of receipt or service of [the] decision." *Id.* However, this analysis is peripheral to the matter at hand. First, plaintiffs' do not argue that their complaint was timely based on Rule 6(e). Second, defendant's reliance on *J.S.* does not explain why identical language in the C.P.L.R. should be interpreted so differently from section 4404, when neither statute mentions the timing of receipt or service of the decision.

Third, defendant points to *Wall Township Board of Education v. C.M.*, 534 F. Supp. 2d 487 (D.N.J. 2008). However, as in *B.D.*, the *C.M.* court was deciding a different issue when it discussed the IDEA's statute of limitations provision. Specifically, it was focused on whether that provision operates as "a jurisdictional bar, [or] instead is a statute of limitations that that may be pled as an affirmative defense." *C.M.*, 534 F. Supp. 2d at 492. The court is not convinced that the *C.M.* court's relatively limited discussion as to when the limitations period commences answers the question presented in this matter.

Finally, the defendant directs the court's attention to *I.D. v. Westmoreland School District*, 788 F. Supp. 632 (D.N.H. 1991), for the proposition that Rule 6(e) does not apply to state statutes of limitation applicable under the IDEA. For the reasons discussed in connection with *J.S.*, this argument is not compelling. Accordingly, the court finds the complaint was filed within the four-month period applicable under section 4404 and is not time-barred.

## II.    The June 2012 IEP

Parents allege that the SRO erred when it affirmed the IHO's finding that the District provided V with a FAPE for the 2012-13 school year. Plaintiffs allege the SRO erred in seven respects: (1) by misconstruing and/or disregarding Parents' arguments regarding the IHO's consideration of the 2010-11 and 2011-12 school years; (2) by ignoring Second Circuit law concerning FBAs; (3) by failing to find that the District's procedural violations cumulatively denied V a FAPE; (4) by failing to consider that the District did not use evidence-based behavioral programming; (5) in finding that V made meaningful behavioral progress during the first and second grade; (6) by failing to find that the District did not offer appropriate counseling and social skills training to address V's social-emotional decline; and (7) in finding that V made meaningful academic progress as a result of the District's implementation of the prior IEPs. ECF No. 1, at 7, 9, 11, 12, 14, 16, 17. Parents also contend that while the IHO and SRO did not reach the second prong of the *Burlington/Carter* test, Parents proved both that Winston Prep was an appropriate placement for V and that the equities favored reimbursement for tuition costs. ECF No. 1, at 19.

### A. <u>V's Progress During the 2010-11 and 2011-12 School Years</u>

Parents argue that the June 2012 IEP constituted a denial of a FAPE because it was "substantially similar to the programs that had failed [V] in 2010-11 and 2011-12." ECF No. 15, at 10. They allege that the CSE denied V a FAPE by recommending programming under which he had previously languished. ECF No. 15, at 10. To this end, Parents submit that the SRO erred in concluding that

V made meaningful progress during the 2010-11 and 2011-12 school years. *See* ECF No. 1, at 14-17; *see also* ECF No. 15, at 10-19. First, Parents argue that like the IHO decision, the SRO decision selectively considered V's experiences during the 2010-11 and 2011-12 years, citing those experiences only when they supported the District's argument that V made progress, and ignoring them when they tended to show the opposite. ECF No. 1, at 8.

The court disagrees with Parents' characterizations of both the IHO and SRO decisions. Like IHO Brandenberg, SRO Krolak referred to details of the 2010-11 and 2011-12 school years only as they pertained to the June 2012 CSE's decision to continue that programming. *See, e.g.,* SRO Decision, at 5 n.6 ("I will consider any facts that occurred during the 2010-11 and 2011-12 school years which are relevant in determining the parents' timely claims related to the 2012-13 school year."). Parents argue that the SRO erroneously failed to consider (1) the validity and soundness of the 2010 FBA and BIP, and (2) the District's use of physical restraints during the previous school years. ECF No. 1, at 8, 13.

SRO Krolak stated he would not consider Parents' claims regarding physical restraints or any claims that accrued prior to June 16, 2012, because, as the IHO had correctly determined, these claims were time-barred under the IDEA's two-year statute of limitations. SRO Decision, at 5 n.6. Parents had "filed their due process complaint notice more than two years after they knew or should have known of the actions forming the basis of their complaint." SRO Decision, at 5 n.6. While the court need not defer to the SRO's conclusions regarding statutes of limitation, *F.L.,* 2017 WL 3574445, at *9, Parents do not

25

assert these issues as freestanding claims. *See, e.g.,* ECF No. 28, at 18 ("Parents are not asserting any legal claims with respect to those restraints."). Parents point to the restraints only to "provide context for the District's June 2012 proposed IEP." *See* ECF No. 28, at 18. Thus, the court need not conduct an independent statute-of-limitations analysis.

Contrary to Parents' assertion that the SRO decision disregarded evidence pertaining to the District's use of physical restraints, the court finds that SRO Krolak took this information into account and concluded that fewer instances of such restraints over time indicated behavioral progress. SRO Krolak noted that whereas staff conducted 3 physical interventions between September 2011 through January 2012, they only conducted 1 physical intervention between February through June 2012, following V's move to the 8:1+2 class. SRO Decision, at 11. Parents object to SRO Krolak's inference of progression from this decline, arguing that a decrease in the number of physical restraints employed throughout the year does not imply progress. ECF No. 15, 17.

The court finds that SRO Krolak's determination on this point demonstrates great familiarity with the record and is the product of well-reasoned analysis. Bearing in mind, however, that progress determinations should be accorded less deference than decisions about appropriate pedagogical methodology, the court also conducts an independent review of the record to determine whether it contains objective indications of V's progress during the 2010-11 and 2011-12 school years. *M.H. v. N.Y.C. Dep't of Educ.,* 685 F.3d 217, 244 (2d Cir. 2012). For the reasons described below, the court concurs with the

IHO and the SRO that V did indeed make progress under the District's programming for the previous school years.

### 1. 2010-11 Programming (First Grade)

The record shows that V struggled in his general education class at the beginning of the 2010-11 school year. The record also shows, however, that the District was both attuned to, and addressing, V's needs through an iterative IEP process. This culminated in its January 5, 2011 recommendation that V be moved from his then-current setting, general education with ICT support, to the special 8:1+2 class. Dist. Ex. 8, at 7. Turning now to the record, the court finds there are numerous objective indications of V's progress following the recommended change in placement.

The October 2010 CSE meeting makes clear that, like Parents, the District recognized that V's problem behaviors had become more challenging and were of primary concern. Parents Ex. YY, at 6. At the beginning of the first grade, V's mood could change quickly and without warning —at times he was "unable to self regulate, agitated and in constant motion." Parents Ex. YY, at 6. For precisely this reason, the District implemented changes to V's educational programming. First, the CSE minutes indicate that the general education classroom schedule was "rearranged with additional supports of smaller group or individual work time offered." Parents Ex. YY, at 6. Second, the District conducted an FBA in the month following the October 2010 CSE meeting. Parents Ex. CCCC. This suggests that the District believed V's behavior posed a risk of interfering with his ability to learn at this time. *See* N.Y. Comp. Codes R. & Regs. tit. 8, §

200.4(b)(1)(v) (requiring an FBA for students "whose behavior impedes his or her learning or that of others"); *see also* ECF No. 25, at 21 (noting District staff conducted FBAs when they observed "significant behaviors that were increasing in frequency and intensity"). Ultimately, the CSE found that V was not able to make progress in the general education setting, which was not suited to his management needs. Dist. Ex. 8, at 7. It determined that the 8:1+2 special class would provide the "intensive setting with support" that V needed. Dist. Ex. 8, at 7.

The CSE recognized that V was not making progress and amended his IEP accordingly. And, as recounted above, V's transition to the 8:1+2 class yielded him significant benefits. The May 2011 CSE minutes indicate that since his change in placement, V made measurable progress in speech-language, in occupational therapy, and in his overall behavior. Dist. Ex. 12, at 2. Nearly every adult that spent time with V observed this growth, both in and outside of the classroom. Parents agreed that the special class placement had helped, noting that V had "demonstrated a lot of progress this year." Dist. Ex. 12, at 2. While V's behavior was still Parents' greatest concern, they found it had improved following the transition. Dist. Ex. 12, at 2. Likewise, school staff found that even in areas where V continued to struggle, there was a positive trend. For example, V's special education teacher and the school psychologist both found that while V still became upset, these episodes were less frequent and less intense than previous tantrums. Dist. Ex. 12, at 2. The special education teacher reported

that despite rare occasions on which V became physical, he displayed greater ability to "accept redirection" and practice "safe behaviors." Dist. Ex. 12, at 6.

The court, having reviewed the record, concurs with SRO Krolak's determination that V made progress during the 2010-11 school year following his transition to the 8:1+2 class (first grade).

2. 2011-12 Programming (Second Grade)

With respect to the 2011-12 school year, the court concurs with SRO Krolak's determination that V continued to make progress in the 8:1+2 special class, and finds the record corroborates his determination.

Parents called the December 2011 CSE meeting to address their concerns regarding the appropriateness of V's IEP. Dist. Ex. 13, at 1. In response to these concerns, school staff members, including V's special education teacher, Jan Bailey; school psychologist, Linda Kalos; and school principal, Robert Kalman, described their observations and interactions with V. Dist. Ex. 13, at 2. Ms. Kalos stated that on the twenty or so occasions on which she had observed V during school, he was generally engaged and on task. Dist. Ex. 13, at 2. Principal Kalman, who had also observed V approximately twenty times, reported similar experiences, apart from one incident where V became physical. Dist. Ex. 13, at 2. Ms. Bailey reported much of the same—V was generally able to access his learning and, day-to-day, required only mild-to-moderate verbal prompting. Dist. Ex. 13, at 2. Overall, V needed relatively little behavior management. Dist. Ex. 13, at 2.

Moreover, as SRO Krolak recounted at length in his decision, according to Ms. Bailey's academic behavior log, V's aggressive behaviors continued to decrease over the course of the 2011-12 school year. SRO Decision, at 11. SRO Krolak examined three categories of maladaptive behaviors that were recorded in the log—verbal aggression, physical aggression, and physical interventions requiring staff involvement—and compared their frequency during the first half of the school year with the latter half. The log indicated decreases in each category. There were 25 fewer instances of verbal aggression, 1 less instance of physical aggression, and 2 fewer instances of physical intervention by staff. SRO Decision, at 11 (finding 37 instances of verbal aggression, 5 instances of physical aggression, and 3 physical interventions from September 2011 through January 2012; finding 12 instances of verbal aggression, 4 instances of physical aggression, and 1 physical intervention from February 2012 through June 2012).[9]

The December 2011 CSE minutes also indicate that during the 2011-12 school year, V had been successful at "pushing in" to a number of mainstream classes, including science labs and other special events. Dist. Ex. 13, at 2. Whereas V had previously struggled in the general education environment, these successful mainstreaming experiences indicate that V continued to make progress in the 8:1+2 class.

---

[9] To the extent that Parents argue Ms. Bailey's log was incomplete, unreliable, or implausible, the court will not disturb the well-reasoned credibility determinations of the IHO and SRO. *M.H.*, 685 F.3d at 255 ("[T]he Court must defer to the IHO and SRO's findings, which were grounded in credibility determinations made by the IHO after hearing the relevant testimony."). With the benefit of nineteen days of hearings, the court accords substantial deference to the IHO's consideration of Ms. Bailey's log and her testimony pertaining to its content.

SRO Krolak also reviewed the June 2012 IEP, which similarly indicated V's progress in 2011-12. Ms. Bailey noted that V's social skills had grown in both "depth and quality." SRO Decision, at 11; Dist. Ex. 27, at 9. As SRO Krolak described in detail, Ms. Bailey and Ms. Kalos noted that V demonstrated "an increase in self-awareness, was working on asking for help, [and] developed basic friendships." SRO Decision, at 12. While "instances of inappropriate social interaction . . . [were] at [that] point rare," V still struggled in unstructured settings. Dist. Ex. 27, at 9; *see also* Dist. Ex. 27, at 11 ("In unstructured settings (such as the lunchroom or playground), the student's social development seems to be much less sophisticated [and] a classroom aide accompanies him to these settings."). In the highly structured special class, however, V "followed classroom routines and exhibited behavioral growth." SRO Decision, at 12; *see also* Dist. Ex. 27, at 12 ("The student has followed the routines of the classroom and made growth this year in a highly structured self-contained classroom.").

Additionally, SRO Krolak reviewed V's progress in speech-language and found the June 2012 IEP and the hearing record both indicated improvement. *See* SRO Decision, at 12. He noted reported progress in V's ability to rhyme and articulate, but found that he continued to have trouble "describing tasks, providing directions, and with social language skills." SRO Decision, at 12. As the speech-language therapist noted, V also made progress in two-way conversation, as well as understanding the temporal concepts "before" and "after." SRO Decision, at 12.

SRO Krolak conducted a thorough and persuasive analysis of V's progress during the 2010-11 and 2011-12 school years. He viewed the strides V had made in the context of his early childhood:

> Prior to age six, [V] was not exposed to English and did not appear to have attended any formal education program. As previously discussed, [V] has received diagnoses of ADHD, reactive attachment disorder, mood dysregulation, and developmental coordination disorder.

SRO Decision, at 12. The record supports SRO's Krolak's determination that V made progress during the 2010-11 and 2011-12 school years, academically and otherwise. The court thus disagrees with Parents' argument that the June 2012 IEP denied V a FAPE because it was substantially similar to previous programming. *See* ECF No. 14, at 10-19.

### B. The June 2012 CSE and IEP

In addition to Parents' objection to the similarity of the June 2012 IEP to the 2010-11 and 2011-12 IEPs, they claim that the June 2012 IEP was independently flawed. Parents argue that the June 2012 IEP "was destined to fail" for two primary reasons—"its lack of behavior data and its omission of a BIP." ECF No. 14, at 19. They also argue that the June 2012 IEP failed to offer (1) appropriate counseling and social skills training and (2) appropriate speech-language and reading programming. ECF No. 14, at 26, 27.

#### 1. The SRO's Finding that the June 2012 CSE Based the IEP on Sufficient Evaluative Data

First, Parents contend that the SRO erred in finding that the June 2012 CSE possessed and considered "sufficient evaluative information to understand [V's] problem behaviors." ECF No. 14, at 24. Under the IDEA, the CSE is obligated

to "review existing evaluation data on the child, including—(i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or State assessments, and classroom-based observations; and (iii) observations by teachers and related services providers." 20 U.S.C. § 1414(c)(1)(A). In developing the IEP, the CSE must consider "[t]he results of the initial or most recent evaluation of the child." 34 C.F.R. § 300.324(a)(1)(iii).

Parents argue that the SRO did not and could not adequately cite valid behavioral data in the June 2012 IEP because it contained only undefined behaviors, such as "verbal aggression, physical aggression, as well as the need for staff to physically intervene with [V] and difficulty with self-regulation, impulsivity, modulating emotions, planning and organizing." ECF No. [P SJ], at 20.

According due weight to SRO Krolak's comprehensive and well-reasoned analysis regarding the June 2012 CSE's review of the evaluative materials in its possession and having conducted an independent review of the record, the court concurs with the SRO's determination that the CSE possessed and considered sufficient evaluative information. SRO Decision, at 18. The court further agrees with the SRO's determination that, based on this information, the June 2012 CSE recommended appropriate counseling, social skills instruction, speech-language therapy, and reading services for the 2012-13 school year. SRO Decision, at 13.

In considering the adequacy of the services it recommended for V, SRO Krolak looked first to the information considered by the June 2012 CSE:

33

> In developing the student's IEP for the 2012-13 school year, the June 2012 CSE considered several documents that discussed the student's needs in the areas of academic achievement, social/emotional/behavioral functioning, language processing, and motor skills including a May 30, 2012 occupational therapy (OT) evaluation report, a June 1, 2012 educational achievement assessment report, a 2011-12 (third grade) report card, a June 5, 2012 neuropsychological evaluation report, and a June 12, 2012 physician letter.

SRO Decision, at 13. And indeed, these evaluations are among those listed in the "Evaluations/Reports" section of the June 2012 IEP. *See* Dist. Ex. 27, at 5. However, Parents direct the court's attention to *L.O. v. New York City Department of Education*, 822 F.3d 95 (2d Cir. 2016), for the proposition that "the burden rest[s] with the [District] to demonstrate which evaluative materials were reviewed *during each CSE meeting* in reaching the terms of the IEPs." ECF No. 15, at 8 (emphasis added) (internal quotations omitted) (quoting *L.O.*, 822 F.3d at 110)). In *L.O.*, the CSE failed to state which, if any, evaluative information it relied upon in crafting the child's IEP. 822 F.3d at 110. The Second Circuit held that the mere existence of such materials at the time the CSE convened, even where they corroborate the terms of the resulting IEP, did not show that the CSE actually relied on the existing evaluative information. *L.O.*, 822 F.3d at 110-11. The court finds that this case differs from *L.O.* because the June 2012 CSE memorialized how it reached the terms of the IEP. *See* 822 F.3d at 110. Here, the IEP demonstrates that the materials were not merely in existence at the time the CSE developed the June 2012 IEP. Rather, it shows that the CSE relied upon these materials in developing its recommendations for the 2012-13 school year.

     *i.*     *Reading and Speech-Language Recommendation*

The IEP notes that while V was "working below grade level in reading," he had made "strong growth" during the 2011-12 school year, as evidenced by various assessments and measures including the Kaufman Test of Educational Achievement, Second Edition ("KTEA-II"), the Fountas & Pinell Benchmark Assessment System ("BAS"), and the Dynamic Indicators of Basic Literacy Skills ("DIBELS"). Dist. Ex. 27, at 7; *see also* 20 U.S.C. § 1414(c)(1)(A)(ii) (requiring the CSE to consider, *inter alia*, such classroom-based assessments). For the KTEA-II letter and word recognition and reading comprehension subtests, V scored within the average range, compared to his below-average score from the December 2011 IEP. Dist. Ex. 27, at 7. According to the BAS measurement, V gained three reading levels from September 2011 to June 2012 (independent level "K" to "N"). Dist. Ex. 27, at 7. This marked a decrease in the discrepancy between V's achievement and grade level expectation, bringing him within two reading levels (independent level "P"). Dist. Ex. 27, at 7. The DIBELS assessment indicated that V's oral fluency rate improved from 39 to 74 words per minute from September 2011 to June 2012. Dist. Ex. 27, at 7. These results were described and discussed during the CSE meeting. Dist. Ex. 27, at 2.

During the year, V had "focused heavily on learning accurate decoding and segmenting words into parts," an area where V "lagged behind" according to the December 2011 IEP. Dist. Ex. 27, at 9. The IEP lists V's ability to rhyme and use context clues as strengths. Dist. Ex. 27, at 9. It lists reading fluency, reading vocabulary, phonemic awareness, spelling ability, and the ability to self-monitor

homework assignments as areas requiring further improvement. Dist. Ex. 27, at 9.

With respect to V's speech-language development, the IEP references both "classroom-based observations" and "observations by teachers and related service providers," to describe V's progress and continued areas of need. 20 U.S.C. § 1414(c)(1)(A); *see also* Dist. Ex. 27, at 9. As SRO Krolak noted in his decision, the CSE minutes provide specific details about V's classroom performance such as his ability to clearly articulate words, his issues with volume control and personal boundaries, his improvement on irregular plural and irregular past tense production, and his struggle to accept cues to break up verbal flow. SRO Decision, at 12; Dist. Ex. 27, at 9. The IEP also described strategies and supports to assist V's speech-language functioning, particularly in less structured environments. Dist. Ex. 27, at 9. For example, to support V's social language development in the lunchroom or on the playground, the IEP notes that a classroom aide accompanied him and used visuals to complement his instruction. Dist. Ex. 27, at 9.

The June 2012 CSE minutes also demonstrate that the CSE considered information and evaluations provided by Parents. *See* 20 U.S.C. § 1414(c)(1)(A)(i) (requiring the CSE to consider such parent-provided information). For example, the meeting notes show that the CSE heard from a private psychologist that Parents hired. Among other things, the psychologist stated that V's academic weaknesses were most pronounced in language arts and "specifically, in reading

decoding, comprehension and written expression." Dist. Ex. 27, at 2. She indicated this was due to a weak phonetic foundation. Dist. Ex. 27, at 2.

Overall, with respect to reading and speech-language skills, the IEP reports that V was "able to manage grade level material" and "complete[] work assignments on a regular basis." Dist. Ex. 27, at 9. He was also "motivated to stay on pace with other third graders and do the same assignments." Dist. Ex. 27, at 9. While his ability to focus was still developing, once focused on an assignment, he had the "capacity to work on the task for very long (50 min +) segment[s] of time." Dist. Ex. 27, at 9.

According deference to SRO Krolak's well-reasoned and thorough determination on the matter, and in light of the record evidence cited above, the court concurs with SRO Krolak's finding that the June 2012 CSE's recommended reading and speech-language services were appropriate and reasonably calculated to confer educational benefit upon V. As the SRO decision notes, the CSE made its recommendation based on its knowledge of V's "overall improvement . . . during the 2011-12 school year," which it determined after consideration of evaluative data from classroom observations and evaluations, state and local assessments, and information provided by Parents. SRO Decision, at 18.

ii.     *Counseling Services and Social Skills Training*

Parents also assert that, in light of "ongoing wetting, bullying and ostracization," the June 2012 IEP failed to recommend appropriate counseling services and social skills interaction. ECF No. 14, at 26. SRO Krolak found that

the CSE's recommendation to continue V's counseling services and social skills training at the same duration and frequency provided during the 2011-12 school year was appropriate and did not constitute a denial of a FAPE. SRO Decision, at 18. In reaching this conclusion, SRO Krolak reviewed the testimony of Ms. Bailey, the school psychologist, the speech-language pathologist, the director of special education, and the school principal. SRO Decision, at 18-19. Parents argue that SRO Krolak erred "by failing to consider testimony of Parent and [V] himself, as well as numerous entries in the home/school log created contemporaneously by both the Parents and Ms. Bailey." ECF No. 14, at 26. As this issue raises questions that are fundamentally credibility judgments, the court defers to the IHO and SRO's well-reasoned decisions. *Scott ex rel. C.S. v. N.Y.C. Dep't of Educ.*, 6 F. Supp. 3d 424, 435 (S.D.N.Y. 2014) ("The Court is 'not to make subjective credibility assessments[ ].' "). This is particularly true with respect to IHO Brandenberg's analysis, which was rendered with the benefit of nineteen days of hearings on this matter. IHO Decision, at 1.

For example, while Parents allege that SRO Krolak erred when he "mentioned but disregarded that Dr. Adler's neuropsychological report . . . indicated that [V] presented with symptoms of anxiety disorder related to academics and socialization," IHO Brandenberg made findings with respect to Dr. Adler's testimony after the nineteen days of hearings. IHO Decision, at 197. IHO Brandenberg noted that the recommended program modifications in the June 2012 IEP were "consistent with what was recommended by Dr. Adler in her evaluation." IHO Decision, at 197. Moreover, SRO Krolak found the hearing

record showed that each of Parents' concerns—"wetting, anxiety, being bullied, social isolation, feeling ostracized, loss of self-esteem, and suicidal ideation"— was the subject of testimony during the IHO hearings. SRO Decision, at 18. Various members of the school staff testified to these concerns and indicated that either the issue had been investigated and addressed, or did not otherwise constitute an ongoing problem. SRO Decision, at 18. The evidence that Parents allege SRO Krolak disregarded was considered by IHO Brandenberg during the nineteen days of hearing. *See, e.g.,* IHO Decision, at 199 ("The Parent testified that they were aware that [V] was mainstreamed during the 2011-12 school year; they believed that [V] enjoyed it; and they encouraged it.").

Accordingly, giving due weight to the administrative decisions below, the court concurs with IHO Brandenberg and SRO Krolak that the June 2012 CSE made appropriate recommendations for counseling services and social skills training that were consistent with the District's "legal obligation to provide an educational program for [V] in the [least restrictive environment]." IHO Decision, at 199.

### 2. The SRO's Finding that the Procedural Violations Made by the June 2012 CSE Did Not Cumulatively Deny V a FAPE

Finally, the court considers Parents argument that the June 2012 CSE's failure to conduct an FBA and its failure to develop a BIP, taken together, constituted denial of a FAPE. ECF No. 1, at 11; ECF No. 15, at 19. Parents contend that "the District's failure properly to evaluate [V]—either with a valid FBA or some other appropriate manner—rendered its IEPs and progress reports improper" such that "the CSE could not provide appropriate behavioral

39

programming for [V]." ECF No. 1, at 11. In addressing these contentions, SRO Krolak found that, in light of behavioral issues that continued to interfere with V's learning during the 2011-12 school year, the District should have conducted an FBA and should have developed a BIP. SRO Decision, at 20. To the extent these failures constituted procedural violations, however, SRO Krolak determined they did not amount to denial of a FAPE because "the June 2012 CSE had sufficient evaluative information regarding [V's] behaviors and the June 2012 IEP adequately identified and described [V's] behavioral needs." SRO Decision, at 20.

The court notes at the outset that the CSE's failure to conduct an FBA and its failure to develop a BIP do not constitute a *per se* denial of a FAPE under the IDEA. *See T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009) (finding SRO's conclusion that District provided child with a FAPE was supported by substantial evidence in the record showing beneficial strategies employed to address child's problematic behaviors). The CSE is only required to conduct an FBA and develop a BIP when there is "evidence that a student's behavior interfered with his or another student's inability to learn." *GB v. N.Y.C. Dep't of Educ.*, 145 F. Supp. 3d 230, 252 (S.D.N.Y. 2015). Applying this standard to the evidence in the record, the court determines that the SRO's finding deserves deference.

In concluding that the CSE had relied upon sufficient information to adequately identify and describe V's behavioral needs even absent an FBA, SRO Krolak looked to: (1) the CSE's consideration of Ms. Bailey's behavioral log for

the 2011-12 school year; (2) the evaluative information relied upon by the 2012 CSE in developing the June 2012 IEP[10]; and (3) the June 2012 IEP itself. *See* SRO Decision 21-26. The SRO decision recounts at length the CSE's findings. These findings were based both on personal observation and interaction with V and from consideration of various evaluations and assessments, described *supra*, that pertained to the causes and circumstances of V's problem behaviors. For example, the CSE found that V's interfering behaviors "usually stemmed from [his] perception of rules and other peoples' failure to conform to the rules or receive appropriate consequences," and/or "transitions to different physical environments." SRO Decision, at 21. SRO Krolak found, "[i]n sum, the CSE had a significant amount of information about [V's] behavioral needs, which it included in the June 2012 IEP." SRO Decision, at 22.

In finding that the June 2012 IEP "identified [V's] behavioral needs and included strategies for managing them," SRO Krolak likewise determined the lack of a BIP did not amount to denial of a FAPE. SRO Decision, at 23. SRO Krolak looked to the methods described in the June 2012 IEP as they corresponded to each of V's behavioral issues, and found that the District adequately addressed the interfering behaviors. For example, "[t]o assist the

---

[10] The court reviewed SRO Krolak's discussion of these evaluative materials, *supra*. This discussion is distinct from, but related to, his finding that the lack of an FBA did not constitute denial of a FAPE because the CSE had sufficient evaluative information regarding V's behaviors. *See* SRO Decision, at 13 ("In developing the student's IEP for the 2012-13 school year, the June 2012 CSE considered several documents that discussed the student's needs in the areas of academic achievement, social/emotional/behavioral functioning, language processing, and motor skills including a May 30, 2012 occupational therapy (OT) evaluation report, a June 1, 2012 educational achievement assessment report, a 2011-12 (third grade) report card, a June 5, 2012 neuropsychological evaluation report, and a June 12, 2012 physician letter.").

student during transitions to different environments, the June 2012 IEP reflected that staff provided verbal prompts including the expectations for transitioning; reminders . . . to attend to the timer; as well as directives to re-perform the physical transition using 'walking feet' or a quieter voice." SRO Decision, at 23. SRO Krolak noted that the IEP also "provided environmental, human, and material resources" such as "a posted schedule, posted classroom rules, flexible seating, [and] provision of a quiet and calm classroom with low visual and auditory input." SRO Decision, at 25. Additionally, the IEP provided for direct supervision and immediate related instruction and feedback during less-structured times. SRO Decision, at 25. The June 2012 IEP further identified "supplementary services/program modifications," including occupational therapy consultation "across all settings" and "testing accommodations on all examinations." SRO Decision, at 26. The June 2012 IEP also sets forth a list of annual goals targeting several skills "including fostering positive feelings, increasing awareness of others' verbal and nonverbal behavior, . . . and developing proactive social and conversational skills." SRO Decision, at 26.

The court agrees with SRO Krolak's conclusion that, in light of V's continued behavioral issues during the 2011-12 school year, the District should have performed an FBA and developed a BIP. It also agrees, however, with SRO Krolak's decision that insofar as these omissions constituted procedural violations, they did not amount to denial of a FAPE. The court concurs with SRO Krolak's well-reasoned determination that even absent an FBA, the June 2012 CSE had sufficient evaluative information to identify V's behavioral issues.

Relatedly, the court agrees that June 2012 IEP included adequate methods and strategies for addressing those problem behaviors even absent a BIP.

## III.  Tuition Reimbursement

Because the court finds that the June 2012 IEP was neither substantively nor procedurally defective—and thus that the District did not deny V a FAPE under the IDEA—it need not address Parents' remaining arguments regarding the appropriateness of V's private placement or whether the equities favor reimbursement. *See M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 66 (2d Cir. 2000) ("If the challenged IEP was adequate, the state has satisfied its obligations under the IDEA and the necessary inquiry is at an end. . . . Only if a court determines that a challenged IEP was inadequate should it proceed to the second question [under *Burlington*].").

CONCLUSION

For the reasons provided above, the court denies Parents' motion for summary judgment in its entirety and grants the District's motion for summary judgment. The court finds that the District did not deny V a FAPE, as required by the IDEA. The court finds that the June 2012 IEP included appropriate programming for the upcoming 2012-13 school year.

SO ORDERED.

Dated:  New York, New York
        November 6, 2017

Thomas P. Griesa
U.S. District Judge